1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  6:10-cr-0009-MJS |
| Plaintiff, | ORDER   GRANTING   DEFENDANT'S MOTION TO SUPPRESS |
| v. | (ECF No. 7) |
| MATTHEW S. ARNOLD, | |
| Defendant. | |
| _____/ | |

In this criminal case, Defendant Matthew Arnold is charged with three counts of possession of MDMA, lysergic acid dethylamide (LSD), and hashish, all controlled substances, in violation of 21 U.S.C. § 844(a), one count of possession of marijuana in violation of 36 C.F.R. § 235(b)(2), and one count of operating a bicycle at night without a light in violation of 36 C.F.R. § 4.30(d)(2).  (ECF No.1.)  Defendant has consented to jurisdiction of the Magistrate Judge for all purposes.

Defendant has moved to suppress all evidence seized and statements made at the time of his arrest on the grounds that they were the product of an unconstitutional search. (ECF No. 7.)  The Court held a hearing on Defendant's motion on September 23, 2010. Testimony was taken from Jarred Mitrea and Scott Jacobs, the two National Park Service Rangers involved in the detention and arrest of the Defendant, and physical evidence was admitted.  The matter was argued and submitted.

For the reasons explained below, Defendant's Motion to Suppress will be GRANTED.

## I.   FACTS

The facts relevant to this motion are essentially undisputed and summarized as follows:

At approximately 2:00 a.m. on June 24, 2010, Ranger Mitrea was on duty near Clark's Bridge in Yosemite Valley, Yosemite National Park, when he observed a bicycle without lights traveling on the roadway over the bridge.  Ranger Mitrea, believing the rider was violating 36 C.F.R. § 4.30(d)(2) by traveling at that time without lights, stopped the bicyclist and subsequently identified him as Defendant Matthew Arnold.  Ranger Mitrea detected the odor of alcohol emanating from Mr. Arnold who, when asked, admitted that he had consumed "a couple of beers."  Ranger Mitrea determined that field sobriety tests should be performed and requested, by radio, another ranger to assist.

Ranger Jacobs arrived soon thereafter and began questioning Mr. Arnold.  Ranger Jacobs asked  Arnold if he had any weapons and Arnold volunteered that he had a "camping knife".[1]  Ranger Jacobs then undertook a "Terry  frisk", i.e., a pat down of the outer clothing of the person being questioned.  See Terry v. Ohio, 392 U.S. 1 (1968). While performing the Terry frisk, Ranger Jacobs felt a hard square object in Mr. Arnold's pocket.  Ranger Jacobs removed the object from Arnold's pocket and handed it to Ranger Mitrea.

The box was admitted into evidence without objection as Government Exhibit 1.  It is a smooth, dark, rectangular wooden box with beveled (rounded) outer edges and corners.  Its exterior measures 2 7/8 inches at its longest point, 2 inches at its widest point, and 3/4 inches in depth.  It is has a decorative diamond pattern running lengthwise across its top and a fabric applied image of a miniature Guinness beer bottle on the bottom.  The center of the top slides off lengthwise to reveal an inner  compartment approximately 2 1/2

---

[1]   At some later date, the knife was returned to Mr. Arnold.  It was not admitted into evidence at the hearing and was described only as a "camping knife".

1   inches long by 1 3/8 inches wide by 1/2 inch deep.

2          Both rangers testified that upon retrieving the box, and based upon their experience

3   and training, they immediately recognized it as a type universally used as a "stash box" for

4   contraband drugs.  The box was opened and found to contain a white powdery substance

5   which the Rangers believed to be either cocaine, heroin or MDMA, in a one inch zip lock

6   bag.  The rangers determined that Mr. Arnold would be arrested for possession of a

7   controlled substance and for bicycling at night without a light.

8          The field sobriety test conducted by Ranger Jacobs did not produce evidence of

9   measurable intoxication.  However, in response to the Rangers' questioning after the box

10  had been opened, Mr. Arnold stated that the substance in it was MDMA, that he had

11  consumed some of that drug earlier, and that he also had marijuana in his backpack.

12  Subsequent inventory of Mr. Arnold's backpack revealed that it contained LSD, hashish

13  and marijuana, and additional MDMA.  Those discoveries produced the charges in the

14  Complaint in this case.  (ECF No. 1.)

15  **II.   ANALYSIS**

16         The Fourth Amendment protects the right of the people to be secure in their

17  persons, houses, papers, and effects against unreasonable searches and seizures.  U.S.

18  Const. amend. IV.  With few exceptions, warrantless searches are per se unreasonable.

19  Katz v. United States, 389 U.S. 347, 357 (1967).

20         Mr. Arnold challenges the constitutionality of his initial detention by Ranger Mitrea,

21  the Terry frisk by Ranger Jacobs, Ranger Jacobs's removal of the wooden box from

22  Defendant's pocket, the opening of the box and, consequently, the admissibility of the

23  drugs that were discovered as a result of these successive procedures.  The Court must

24  independently analyze the constitutionality of each successive intrusion and will do so

25  below.  See United States v. Thomas, 863 F.2d 622, 628 (9th Cir. 1988).

26         **A.   Initial Stop**

27         "An investigatory stop must be justified by some objective manifestation that the

28  person stopped is, or is about to be, engaged in criminal activity."  United States v. Cortez,

1   449 U.S. 411, 417 (1981).  The Court must consider the totality of the circumstances to

2   determine whether the officer had "a particularized and objective basis for suspecting the

3   particular person stopped of criminal activity."  Id. at 417-18.

4       Ranger Mitrea testified that he stopped Mr. Arnold for suspicion of violating 36

5   C.F.R. § 4.30(d)(2) which prohibits, amongst other things, operating a bicycle between

6   sunrise and  sunset without a white light or reflector that is visible from at least 500 feet on

7   the front and a red light or reflector visible from at least 200 feet on the rear.   Mitrea

8   testified that he encountered Mr. Arnold at approximately 2:00 a.m. and that Mr. Arnold's

9   bicycle did not have any lights.  Based on this uncontroverted evidence, Ranger Mitrea had

10  a particularized and objective basis for believing that Mr. Arnold was violating the law, i.e.,

11  engaging in criminal activity.  Thus, the stop did not violate the Fourth Amendment.

12      **B.    Terry Frisk**

13      Once a person is legally seized, an officer may conduct a limited pat-down for

14  weapons "for the protection of the police officer, where he has reason to believe that he

15  is dealing with an armed and dangerous individual."  Terry, 392 U.S. at 27; United States

16  v. Flatter, 456 F.3d 1154, 1157 (9th Cir. 2006). Courts give some deference to the

17  expertise of the police in making such decisions.  A trained police officer may well "draw

18  inferences and make deductions—inferences and deductions that might well elude an

19  untrained person . . .  [T]he evidence thus collected must be seen and weighed not in

20  terms of library analysis by scholars, but as understood by those versed in the field of law

21  enforcement."  Cortez, 449 U.S. at 418.  The Ninth Circuit has observed that safety

22  determinations by officers are "best left to the discretion of the officers in the field who

23  confront myriad circumstances we [judges] can only begin to imagine from the relative

24  safety of our chambers."  United States v. Williams, 419 F.3d 1029, 1034 (9th Cir. 2005).

25      After responding to Ranger Mitrea's call for assistance in administering field sobriety

26  tests, Ranger Jacobs asked Mr. Arnold if he had any weapons on his person.  Arnold

27  responded that he had a knife (a camping knife).  Ranger Jacobs then proceeded to

28  perform a Terry frisk.  Ranger Jacobs testified that he performed the Terry frisk because

he thought Mr. Arnold could be armed and dangerous based on the following:  (1) when asked whether he had a weapon, Arnold responded that he had a knife; (2) Jacobs had received training to the effect that, with respect to weapons, "where there's one, there's more"; (3) the officers and Arnold were in a dark area of the Park; (4) Arnold was large in stature; and (5) Jacobs had to be in particularly close proximity to Arnold while performing field sobriety tests.  It is undisputed that Arnold exhibited no signs of aggression, offered no resistance to the officers at any time, and showed only minimal signs of intoxication.

Courts have identified a wide variety of factors that can support a reasonable belief that an individual is armed such that a Terry frisk is warranted, e.g., a visible bulge in a suspect's clothing large enough to be a weapon, see United States v. Alvarez, 899 F.2d 833, 839 (9th Cir. 1990), sudden movements or repeated attempts to reach for an object not immediately visible to the officer, see United States v. Flippin, 924 F.2d 163, 164-66 (9th Cir. 1991), or the nature of the crime suspected, i.e., "some crimes are so frequently associated with weapons that the mere suspicion that an individual has committed them justifies a patdown search." Flatter, 456 F.3d at 1158 (collecting cases involving robbery, large-scale narcostics dealing, and nighttime burglary).  However, the mere fact that an officer is going to be in close contact with a suspect does not justify performing a Terry frisk.  See Flatter, 456 F.3d at 1157-58 (9th Cir. 2006) (close quarters of an interrogation room do not justify Terry frisk).  Nor does the size of the individual alone merit a frisk.  See United States v. Thomas, 863 F.2d 622, 629 (9th Cir. 1987) (officer cannot frisk suspect merely because he is "pretty big").

Nothing in Mr. Arnold's behavior or appearance could have led a reasonable officer to suspect that he was armed and dangerous.  Biking without a light is anything but an inherently dangerous crime. Yosemite National Park is not a crime-ridden area. Mr. Arnold made no  sudden movements.  He did not attempt to reach for something in a way to suggest he was armed.  Ranger Jacobs could not perform a Terry frisk simply because Arnold was large in stature or because he was going to be in close proximity during the performance of the field sobriety tests.

1    However, upon questioning, Mr. Arnold admitted to Ranger Jacobs that he had a

2    knife on his person.  This admission constituted specific and articulable facts such that a

3    reasonable officer could, conceivably, believe that Arnold was armed and dangerous.

4    Thus, giving great deference to the judgment of a trained officer in the field, the Court finds

5    that the Terry frisk for weapons did not violate the Fourth Amendment.[2]

6          ## C.    Scope of Terry Frisk

7          The scope of a permissible Terry frisk "must be strictly 'limited to that which is

8    necessary for the discovery of weapons which might be used to harm the officer or others

9    nearby.'"  Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (quoting Terry, 392 U.S. at

10   26).  "The sole justification of the search . . . is the protection of the police officer and

11   others nearby, and it must therefore be confined in scope to an intrusion reasonably

12   designed to discover guns, knives, clubs, or other hidden instruments for the assault of the

13   police officer."  Terry, 392 U.S. at 29.  If, in conducting a lawful Terry frisk, an officer feels

14   an object whose contour or mass makes its criminal nature "immediately apparent", the

15   object may be seized; if the officer determines the object is not a weapon and it is not

16   immediately apparent that it is contraband, continued search violates the Fourth

17   Amendment.  Dickerson, 508 U.S. at 377-378.

18         In United States v. Miles, 247 F.3d 1009 (9th Cir. 2001), two police officers were on

19   patrol in Portland, Oregon at about 1:40 a.m. when they were advised by radio that a black

20   male wearing an oversized jacket and riding a ten speed bicycle had fired a gun at a

21   nearby residence known to sell drugs.  The officers patrolled the area around the shooting

22   and within twelve minutes of the call found defendant Miles, a black male wearing an

23   oversized jacket, standing in a yard near a ten speed bicycle.  The officers directed Miles

24

25         [2] The Court notes that there is conflicting evidence as to when Arnold's knife was
26   recovered—that is, whether it was recovered before or during the frisk.  At the hearing, both rangers
     testified that they believed the knife was recovered during the frisk, though this arguably conflicted with
27   their prior reports.  Mr. Arnold did not testify.  In the absence of conflicting testimony, the Court finds for
     the purposes of the instant motion that the knife was recovered during the frisk.  The Court cautions the
28   Government, however, that if the knife had been recovered or was voluntarily relinquished by the
     defendant prior to the frisk, the Court would be much more hesitant to find that the frisk was constitutional.

1  to kneel, handcuffed him, and searched his person.  In the course of their search, one

2  officer came across a hard box-shaped object in Miles's pocket.  The officer moved the box

3  up and down and back and forth, producing a sound which he recognized as being similar

4  to that made by loose bullets in a container.  The officer removed the box, which was

5  approximately 2 1/2 by 1 1/2 by one inch in size; the court described it as one-half the size

6  of a package of cigarettes.  The officer opened the box and found that it did in fact contain

7  bullets.  A gun found in the vicinity used the same kind of ammunition as that found in the

8  box.  Miles was arrested and charged with being a felon in possession of a firearm and

9  ammunition. Id. at 1009-12, 1014.

10  Before trial, Miles filed a motion to suppress on the grounds that neither the Terry

11  frisk nor the removal and opening of the box passed constitutional muster.  The district

12  court denied the motion on both grounds.  The Ninth Circuit reversed and remanded upon

13  finding that, although the stop and frisk were acceptable, the officer exceeded the scope

14  of the authorized search when he moved and shook the box in Miles's pocket. Id. at 1015.

15  The court acknowledged that when, during a lawful patdown, an officer finds an object he

16  recognizes as contraband or evidence, arrest of the person and seizure of the item may

17  be justified.  Id. at 1013 (citing Dickerson, 508 U.S. at 375-76).   However, the court

18  emphasized that the identity of the item as contraband or evidence must be "immediately

19  apparent" to the officer.  Id.  Once the officer felt what was obviously a small box and not

20  possibly a weapon,[3] he had "reached the outer limits of his patdown authority." Id. at 1014.

21  The officer "had no cause to shake or manipulate the tiny box on the pretext he was still

22  looking for a weapon." Id. at 1015.  See also Dickerson, 508 U.S. at 378 (holding that an

23  officer had exceeded the limits imposed by Terry when he continued "squeezing, sliding,

24  and otherwise manipulating the contents of the defendant's pocket, a pocket which the

25  officer already knew contained no weapon.")

26  In United States v. Hartz, 458 F.3d 1011 (9th Cir. 2006), officers stopped the

[3] There was no testimony in Miles that the officer believed the small box could constitute or contain a weapon.

1    occupants of a vehicle on suspicion of armed robbery and carjacking.  After ordering both

2    the driver and the passenger out of the vehicle, the officers saw a knife, gun, and

3    ammunition in plain view inside the vehicle.  During a patdown search of the passenger,

4    the officers felt a small hard box in his pocket.  The officers removed the box, opened it,

5    and found that it contained unmarked pills.  At the suppression hearing, the officer testified

6    that he believed that the box could be or could contain a weapon.  The Ninth Circuit held

7    that the officers had "good reason to suspect that [the passenger] could be armed and

8    dangerous" based on the nature of the suspected offense and the presence of other

9    firearms; under those circumstances, the officer's belief that the small box could be or

10   could contain a weapon was reasonable.  Thus, removal of the box from the suspect's

11   pocket did not violate the Fourth Amendment.  Id.

12       During argument in the present case, the Government distinguished the facts here

13   from those in Hartz based on Ranger Jacobs's testimony that he believed the box was or

14   could contain a weapon at the time he removed it from Mr. Arnold's pocket.[4]   The

15   Government also suggested that, based on relevant case law, an officer could manipulate

16   any object, regardless of size, shape, or density, if the purpose of such manipulation was

17   to determine if the object was a weapon.

18       To a similar argument in Miles, the Ninth Circuit responded:   "Under the

19   government's logic there would be no limit to the bounds of a Terry stop.  Rather, looking

20   for the proverbial 'needle in a haystack' would become the norm."  Miles, 247 F.3d at 1015.

21   In the Fourth Amendment context, the Supreme Court "has consistently eschewed bright-

22   line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry."

23   Ohio v. Robinette, 519 U.S. 33, 39 (1996).  This is because the "touchstone" of the Fourth

24   Amendment "is reasonableness, which is measured in objective terms by examining the

25   totality of the circumstances" of each particular case.  Id.  The Court does not believe that

26

27       [4]  The rangers testified that they did not have any reason to believe the container in the pocket
     contained contraband until after they removed it from Mr. Arnold's pocket and examined it visually.  That
28   testimony makes this case distinguishable from U.S. v. Mattarolo, 209 F.3d. 1153 (9th Cir. 2000), relied
     upon by the Government in opposition to the instant motion.

1   Hartz established a bright-line rule that an officer can remove or manipulate any object
2   regardless of its size, shape, or density under the guise of concern for officer safety.  To
3   interpret Hartz as such would turn Terry on its head and expose any individual suspected
4   of criminal activity to an almost limitless search of their person and possessions.  The
5   Fourth Amendment does not allow that.

6          Thus, the salient question is whether, considering the totality of the circumstances
7   in this case, it was reasonable for Ranger Jacobs to believe that the small hard box in
8   Arnold's pocket could constitute or contain a weapon.  Mr.  Arnold was stopped for
9   bicycling at night, a crime certainly not reasonably associated with an armed and
10  dangerous perpetrator.  Nothing in the record suggests that Mr. Arnold was uncooperative
11  or acted in a threatening manner at any time during the encounter.  Ranger Mitrea stood
12  alone with Mr. Arnold, without conducting a Terry frisk, until Ranger Jacobs responded to
13  perform  field sobriety tests.  Both rangers testified that Mr. Arnold showed minimal signs
14  of intoxication.

15         The only inclination that Mr. Arnold was armed was his admission that he possessed
16  a camping knife. Ranger Jacobs testified that he believed with respect to weapons, "where
17  there's one, there's more".  While that may indeed be true in some cases, the facts of this
18  case were such as to suggest the contrary.  Possessing a camping knife in a National Park
19  is so common that it cannot in and of itself suggest the likelihood of additional weapons.[5]
20  Mr. Arnold's volunteering the knife's existence is not consistent with a simultaneous desire
21  to conceal another weapon.  As noted, the nature of the crime here does not suggest the
22  likelihood of an armed perpetrator.  Clearly, the facts of this case are a far cry from those
23  involving  suspected burglars and carjackers in possession of a knife, gun, and ammunition
24  as in Hartz.

25         Once the camping knife was recovered, it was not reasonable to believe that the
26  small box in the pocket of a cooperative individual who had shown no signs of aggression

27

28          [5]  Indeed, Ranger Mitrea testified that nearly everyone he encounters in the Park possesses some
       variety of camping knife.

1  was or could contain a weapon.  Thus, the Court finds that removal of the box from

2  Arnold's pocket under these largely innocent circumstances exceeded the allowable scope

3  of a <u>Terry</u> frisk.  Ranger Jacobs's manipulation of the box by removing it from Mr. Arnold's

4  pocket violated the Fourth Amendment.

5        The arresting officers testified that it was the removal and visual inspection of the

6  box that caused them to identify it as a container typically used to carry illegal substances.

7  They also testified that it was that inspection which ultimately led to their determination to

8  arrest Mr. Arnold, question him regarding drugs and thereby generate the evidence with

9  which the government purports to prosecute him here for possession of controlled

10  substances.  Thus, the products which are the subject of the prosecution must be deemed

11  the proverbial fruit of the poisonous tree and be excluded from consideration as evidence

12  in the prosecution of this case.  <u>See, e.g.</u>, <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-

13  88 (1963).

14  **IV.    <u>CONCLUSION AND ORDER</u>**

15        For the reasons stated above, Defendant's Motion to Suppress is **GRANTED**.

16

17  IT IS SO ORDERED.

18  Dated:    November 3, 2010            /s/ *Michael J. Seng*
                                        UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28